**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| RICHARD L. CORESON, | ) |
|     Plaintiff, | )  No. 03:13-cv-01979-HU |
| vs. | ) |
| CAROLYN W. COLVIN, | ) **FINDINGS & RECOMMENDATIONS** |
| Commissioner of Social Security, | ) |
|     Defendant. | ) |

—————————————————————————————

James S. Coon
Swanson, Thomas, Coon & Newton
The Thomas Mann Building
820 SW 2nd Avenue, Suite 200
Portland, OR 97204

  Attorney for Plaintiff

S. Amanda Marshall
United States Attorney
Ronald K. Silver
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2904

David Morado
Regional Chief Counsel, Region X, Seattle
L. Jamala Edwards
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, WA 98104-7075

  Attorneys for Defendant

1 - FINDINGS & RECOMMENDATIONS

1    HUBEL, United States Magistrate Judge:

2       The plaintiff Richard L. Coreson seeks judicial review,

3    pursuant to 42 U.S.C. § 405(g), of the Commissioner's final deci-

4    sion denying his application for Disability Insurance ("DI")

5    benefits under Title II of the Social Security Act, 42 U.S.C.

6    § 1381 *et seq*. Coreson argues the Administrative Law Judge ("ALJ")

7    erred in rejecting the opinion of Coreson's treating physician,

8    failing to give legally sufficient reasons for rejecting portions

9    of Coreson's testimony, and rejecting lay witness testimony without

10   offering reasons "germane" to the witness. *See* Dkt. ##12 & 18.

11

12                    ***I.  PROCEDURAL BACKGROUND***

13      Coreson protectively filed his application for DI benefits on

14   September 29, 2010, claiming disability since November 17, 1998,

15   when he was 50 years old. (A.R. 11[1]; 141-42) Coreson claims he is

16   disabled due to a combination of conditions including HIV, bron-

17   chitis, rheumatoid arthritis, PSVT (paroxysmal supraventricular

18   tachycardia[2]), mitral valve prolapse[3], and high cholesterol. (*See*

19   ────────────────

20      [1]The administrative record ("A.R.") was filed electronically
     using the court's CM/ECF system. Dkt. #8 and attachments. Pages
21   of the A.R. contain at least three separate page numbers: two
     located at the top of the page, consisting of the CM/ECF number
22   (e.g., Dkt. #8-3, Page 12 of 57) and a Page ID#; and a page number
     located near the upper right of the page, representing the
23   numbering inserted by the Agency. Some pages also contain a page
     number inserted by the office supplying the records. Citations
24   herein to "A.R." refer to the agency numbering near the lower right
     corner of each page.

25
        [2]"Paroxysmal supraventricular tachycardia (PSVT) is episodes
26   of rapid heart rate that start in a part of the heart above the
     ventricles." Symptoms of the condition "most often start and stop
27   suddenly. They can last for a few minutes or several hours."
     Symptoms may include anxiety, chest tightness, palpitations, rapid
28                                                (continued...)

2 - FINDINGS & RECOMMENDATIONS

A.R. 155)  He claims he has been unable to work since 1998, because his symptoms and medications cause severe fatigue, and pain and swelling in his hands and knees, resulting in extreme limitations in his physical functional abilities.  (A.R. 166-67)

Coreson's application was denied initially and on recon-sideration.  (A.R. 77-80; 86-88)  Coreson requested a hearing, and a hearing was held on August 7, 2012, before an ALJ.  Coreson was represented by an attorney at the hearing.  Witnesses at the hear-ing included Coreson, his daughter Latricia Payer, a vocational expert ("VE"), and a medical expert.  (A.R. 23-56)  On September 6, 2012, the ALJ issued his decision, denying Coreson's application for benefits.  (A.R. 11-19)  Coreson appealed the ALJ's decision, and on September 24, 2013, the Appeals Council denied his request for review (A.R. 1-5), making the ALJ's decision the final decision of the Commissioner.  *See* 20 C.F.R. §§ 404.981, 416.1481.  Coreson filed a timely Complaint in this court seeking judicial review of the Commissioner's final decision denying his application for DI benefits.  Dkt. #1.  The matter is fully briefed, and the under-signed submits the following findings and recommended disposition of the case pursuant to 28 U.S.C. § 636(b)(1)(B).

---

[2](...continued)
pulse, shortness of breath, and sometimes dizziness and fainting.
http://www.nlm.nih.gov/medlineplus/ency/article/000183.htm (visited 10/23/2014).

[3]Mitral valve prolapse (MVP) occurs when one of [the] heart's valves is "floppy," and fails to close tightly.  "Most of the time, MVP doesn't cause any problems.  Rarely, blood can leak the wrong way through the floppy valve."  When that occurs, symptoms may include palpitations; shortness of breath; coughing; fatigue; dizziness; anxiety; migraine headaches; and chest discomfort. http://www.nlm.nih.gov/medlineplus/mitralvalveprolapse.html (visited 10/23/2014).

3 - FINDINGS & RECOMMENDATIONS

Preliminarily, the court notes Coreson previously filed an application for benefits in approximately 2000, which resulted in a hearing, and a denial by an ALJ dated March 31, 2004. (*See* A.R. 28-29) Because Coreson's date last insured was December 31, 2004 (*see* A.R. 26-27), the prior denial would still leave a period for consideration prior to his date last insured. (*See* A.R. 29) However, the ALJ in the present case noted the file from the prior application for benefits likely had been destroyed, or at least it could not be located. The ALJ therefore indicated he would "go ahead and consider the evidence for the entire period alleged, rather than just considering the evidence for that particular limited period." (*Id.*) In other words, in the present case, the ALJ considered "the period from the alleged onset date, which is November 17th of 1998, through the date last insured, December 31, 2004." (*Id.*)

## II.  FACTUAL BACKGROUND

### A.  Summary of the Medical Evidence

Coreson first applied for private disability benefits "when he became unable to work in 1998." (A.R. 126) At that time, Coreson was working as "a managerial employee at the Oregon Department of Fish and Wildlife[.]" (*Id.*) Ensuing litigation regarding coverage ultimately was "resolved in favor of Mr. Coreson." (A.R. 126) As part of that litigation, on January 6, 2000, Coreson's treating physician Douglas Beers, M.D. gave a deposition in which he testified extensively regarding Coreson's condition from about 1992 forward. (*See* A.R. 209-49) In the present case, Coreson relies heavily on Dr. Beers's testimony.

4 - FINDINGS & RECOMMENDATIONS

1    Dr. Beers testified that he is board-certified in Internal
2  Medicine.  He described himself as "an HIV specialist," and he is
3  extensively involved in clinical research and education regarding
4  HIV.  (A.R. 201-02)  He sees patients for a variety of medical
5  problems, including about 250 HIV patients (amounting to about 20%
6  of his practice).  (A.R. 203-04)  According to the doctor, he has
7  "the largest HIV practice in the state," and he considers himself
8  to be an expert in the treatment of HIV.  (A.R. 204-05)

9    Dr. Beers did not recall when he first began seeing Coreson,
10 noting his earliest records were unavailable.  However, he believed
11 an attending physician's statement was correct in stating he had
12 been seeing Coreson since 1990.  (A.R. 205-06)

13   Dr. Beers's records from November 1998, indicated at that time
14 Coreson "was really suffering from profound fatigue, generalized
15 achiness, and depression . . . [a]ll of which are characteris-
16 tically very interrelated." (A.R. 208)  He indicated that although
17 Coreson was suffering from a number of symptoms, profound fatigue
18 was his most disabling symptom.  He further stated that fatigue can
19 be exacerbated by muscle and joint aches, "such that it's often
20 very difficult for people to sort of distinguish within themselves
21 which is which." (A.R. 209)

22   With regard to Coreson's depression, Dr. Beers had prescribed
23 Paxil and Effexor.  The doctor indicated depression and other
24 mental disorders also can contribute to extreme fatigue.  (A.R.
25 210-11)  The doctor indicated Coreson's fatigue could be related to
26 several factors, including his HIV, rheumatoid arthritis, joint
27 pain, loss of his ability to work at his job, and loss of the
28 ability to socialize with his friends.  (A.R. 236; see A.R. 230-36)

5 - FINDINGS & RECOMMENDATIONS

Coreson also had a number of stressors in his personal life which the doctor indicated could trigger depression.   (A.R. 240-42)

Dr. Beers explained, at some length, how a person with HIV who otherwise appears to have "good" test results (high CD4 counts and low viral load) still can suffer from a variety of HIV-related problems, such as inflammation of the central nervous system, mito-chondrial diseases that can ultimately cause death from metabolic failure, and endocrinologic issues.   (A.R. 212-14)   He stated doctors have "known for some time that there are patients with HIV whose fatigue is out of proportion with other findings of severity of illness."   (A.R. 214)   In his practice, he has noticed a simi-larity between rheumatoid arthritis patients and HIV patients in terms of fatigue, where "characteristically a good day is followed by a bad day." (A.R. 214-15)   He explained:

> If somebody feels very well, is more active one day, the next day the bathroom looks like it's a mile away.
> And very early on I noticed that with my HIV patients if they had a good day and did more that characteristically they would be really incapable of functioning the next day.
> And my patients finally learned, many of them, would make sure that they would rest for a day or two before coming to a physician's appointment.

(A.R. 215)   Although these types of symptoms are seen more often in people with a higher viral load and lower CD4 counts, doctors also have seen these symptoms "in really severe form in patients with low viral load and high CD4 counts." (*Id.*)

Dr. Beers saw Coreson in November 1998, when Coreson presented with profound fatigue, widespread achiness, and depression.   The doctor suspected rheumatoid arthritis, which was confirmed with blood tests.   Dr. Beers stated he has seen hundreds of patients

6 - FINDINGS & RECOMMENDATIONS

with rheumatoid arthritis, having taken over the practice of a rheumatologist who was retiring. (A.R. 221-22)  The doctor explained that rheumatoid arthritis typically follows a three-step progression, and it is in "the early rheumatoid phase" that people "very characteristically . . . are most fatigued and most system- ically affected[.]" (A.R. 224)  He explained that in the early stages of the disease, people may look the most well, but actually suffer the most severe symptoms.  This is true even if X-rays fail to show destructive changes in the joints.  Dr. Beers stated it generally "will take 10 years of rheumatoid arthritis to develop significant radiologic changes." (A.R. 224-25)

The doctor indicated Coreson's condition was worse in 2000 than it had been in 1998.  In the doctor's opinion, since 1998, it had become increasingly difficult for Coreson to perform his job duties. (A.R. 244-45)

A treatment note from Dr. Beers dated October 28, 1999, indicates Coreson "continues to be profoundly disabled secondary to his HIV disease, depression, and rheumatoid arthritis.  These all continue to plague him in a synergistic way." (A.R. 457)  Coreson had had to "stop[] his medications in August secondary to losing his insurance and not having enough money to afford them." (*Id.*)

Coreson saw Dr. Beers on April 7, 2000.  Although he continued "to feel profoundly fatigued," he was "functioning at a somewhat better level with his anxiety decrease[d]" since his lawsuit was settled. (A.R. 453)  His rheumatoid arthritis was under "somewhat better control," with "no flaring joints at this time." (*Id.*)  He was tolerating his HIV medications well. (*Id.*)

7 - FINDINGS & RECOMMENDATIONS

1    Coreson underwent an MRI of his cervical spine on July 27,
2    2003.  The study showed "[d]egenerative changes at C5-6 and C4-5
3    levels with left paracentral disk abnormalities causing neural
4    foraminal stenosis."  (A.R. 439)

5    Coreson saw Dr. Beers on August 12, 2004.  Notes indicate
6    Coreson was off his antiretroviral medications at this time, but he
7    was doing well so he was not placed back on therapy.  He had
8    experienced a recent flare of his rheumatoid arthritis, with "a
9    marked increase in his stiffness with increase in fatigue . . .
10   somewhat worse in the morning on many occasions but he also has
11   very bad afternoons."  (A.R. 291)  If he was very active, he would
12   experience a marked exacerbation of symptoms the next day.  In
13   addition, he was having "increasing problems with nausea and
14   diarrhea," which the doctor suggested could be due to "possible
15   association between rheumatoid arthritis and some inflammatory
16   bowel disease."  (*Id.*)

17   Dr. Beers's treatment notes dated December 16, 2004, indicate
18   Coreson had "been off his anti-retroviral medications for about 3
19   years with a stable CD4 count and a stable viral load," with "no
20   evidence of any opportunistic infections and no progression of
21   disease."  (A.R. 290)  The plan was for Coreson to stay off
22   medications as long as his CD4 count remained above 250.  (*Id.*)
23   The doctor also examined Coreson in connection with his complaint
24   of left shoulder and arm pain that began when he reached behind
25   himself to open a blind.  Coreson was "able to passively flex and
26   extend the shoulder about 45 degrees but passive or active
27   abduction of the shoulder [was] completely impossible."  (*Id.*)  In
28   addition, due to pain, he was unable to rotate the shoulder in any

8 - FINDINGS & RECOMMENDATIONS

direction.   The doctor diagnosed a possible tendon tear, and ordered an MRI for further evaluation before undertaking any treatment.  (*Id.*)  The MRI was performed on December 23, 2004, and showed "[n]o rotator cuff tear or specific findings of impinge-ment[.]"  (A.R. 299)

The next treatment note is some sixteen months later, when Coreson saw Dr. Beers on February 13, 2006.  His CD4 count had begun to drop, and his viral load had risen suddenly.  Coreson was "feeling somewhat more fatigued[.]"  (A.R. 288)  His rheumatoid arthritis was under fairly good control, and he had "been able to function at a fairly stable level recently with no recent exacerbations of frank synovitis."  (*Id.*)  The doctor prescribed a combination of antiretroviral medications for Coreson's HIV disease.  (*Id.*)

On April 11, 2006, Coreson was seen by Laura M. Vanderwerff, M.D. for a complaint of a popping sensation "in his left medial section of his eye," accompanied by a burning-type irritation and redness.  (A.R. 285)  The doctor noticed Coreson's eyes were slightly jaundiced, which she attributed to one of Coreson's medications.  She observed "a pretty distinct conjunctival hemor-rhage on the medial aspect of the left eye," but no foreign body, and no impairment of his vision.  (*Id.*)  The doctor reassured Coreson that no further treatment was needed at this time, but she encouraged him to follow up with his eye doctor.  (*Id.*)

When Dr. Beers saw Coreson on April 18, 2006, Coreson com-plained of some resurfacing of the symptoms of his rheumatoid arthritis.  On examination, Coreson exhibited markedly decreased grip strength, and "decreased range of motion in the joints of his

9 - FINDINGS & RECOMMENDATIONS

1  hands, wrists, and elbows." (A.R. 283)  Nevertheless, treatment
2  notes do not indicate any change was made to his rheumatoid
3  arthritis medications.  The doctor did, however, make a change to
4  Coreson's HIV medications, in an attempt to deal with ongoing
5  gastrointestinal symptoms from his current medications.  (*Id.*)

6      Coreson saw Dr. Beers on October 23, 2006.  He was suffering
7  ongoing nausea from his current regimen of HIV medications.  The
8  doctor changed the dosing schedule in hopes they could identify
9  which medication was causing the problem.  Coreson's rheumatoid
10 arthritis was causing some ongoing stiffness that impaired some of
11 his overall functioning, but otherwise, his condition had not
12 progressed significantly.  He indicated he was "happy to continue
13 to manage this with only some occasional p.r.n. opiate therapy and
14 his ongoing hydroxychloroquine." (A.R. 282)

15     By the next time Coreson saw Dr. Beers, on July 18, 2007, he
16 was tolerating his HIV medications well.  He had "consistent good
17 suppression of his virus with no apparent adverse affects [sic].
18 His most recent viral load in May was undetectable with a CD4 count
19 up to 570." (A.R. 281)  On the other hand, Coreson had been
20 experiencing a flare of his rheumatoid arthritis symptoms for
21 several months, "with associated increase in fatigue." (A.R. 281)
22 He reported "pain and stiffness in his hands, particularly in the
23 morning, with some pain and stiffness in his knees and ankles."
24 (*Id.*) Two of his joints showed slight swelling, without associated
25 erythema or heat.  His grip strength was decreased at 16 kg on the
26 right, and 22 kg on the left, "down from his baseline 26 kg and 26
27 kg." (*Id.*)  He was taking hydroxychloroquine for his arthritis,
28 and the doctor added salsalate to his medication regimen.  (*Id.*)

10 - FINDINGS & RECOMMENDATIONS

1    The next treatment note from Dr. Beers is dated nine months
2    later, on April 1, 2008, when Dr. Beers noted Coreson was "doing
3    very well" on his current combination of medications.   At this
4    time, Coreson's rheumatoid arthritis was "certainly his most vexing
5    issue[.]"   (A.R. 279)   He had been experiencing a flare of his
6    arthritis for about four months, "with marked increase in his pain,
7    stiffness, and swelling." (*Id.*)   His grip was "profoundly impaired
8    with a 3 kg grip on the right and a 6 kg grip on the left," and
9    Coreson reported that "multiple activities of daily living [were]
10   markedly impaired[.]"   (*Id.*)   He was having "increased pain without
11   frank warmth or redness in the knees, bilaterally, right greater
12   than left," which was "significantly impairing his ability to
13   walk."   (*Id.*)   The doctor started Coreson on methotrexate, and
14   planned to add sulfasalazine in one month.   (*Id.*)

15      Coreson saw Dr. Beers on May 5, 2008.   He was doing well on
16   his current HIV regimen.   His grip strength was improving on his
17   rheumatoid arthritis regimen, with grip on the right up to 9 kg.,
18   and on the left up to 20 kg., which the doctor noted was "a sub-
19   stantial improvement." (A.R. 278)   Because Coreson was doing well,
20   Dr. Beers decided not to add sulfasalazine yet.   (*Id.*)

21      Coreson saw Dr. Beers on June 10, 2008.   His HIV remained in
22   good control on his current combination of medications.     His
23   current rheumatoid arthritis medications had resulted in "consid-
24   erable improvement in his grip," with his right hand up to 16 kg.,
25   and his left hand up to 22 kg.   He also was "having markedly less
26   synovitis, less pain, less erythema and no real warmth."   (A.R.
27   277)   The doctor added sulfasalazine to get Coreson "on a full 3-
28   drug regimen without TNF alpha inhibitors."   (*Id.*)   Coreson was

11 - FINDINGS & RECOMMENDATIONS

pleased with the "overall improvement in his functional status." (*Id.*)

On July 22, 2008, Coreson saw Dr. Beers for followup.  He was doing well on his current antiretroviral regimen.  He was experiencing "a slight improvement in his overall functional status, though he still [had] trouble gripping things on the right[.]" (A.R. 276)  His arthritis medications were continued without change.  (*Id.*)

Coreson saw Dr. Beers on September 3, 2008, complaining of "a little bit of synovitis in his right hand," and "some slight increase in grip pain" in his left hand.  (A.R. 275)  His arthritis medications were continued without change.  Coreson was doing well on his HIV medication regimen, tolerating the medications well and feeling well on the combination of atazanavir, abacavis, and lamivudine.  (*Id.*)

Coreson saw Dr. Beers on October 23, 2008.  He was experiencing "considerable stiff joints," and more pain, particularly in his right middle finger.  His grip on the right was 15 kg., with left grip of 33 kg.  According to Dr. Beers, Coreson's grip strength and pain on the right were becoming much more of a problem, "and impairing his functional status[.]"  (A.R. 273)  Coreson was referred to Dr. Dan Sager for consultation regarding the possible initiation of Remicade or other therapy.  Coreson's HIV was under good control on his current medications, and other than his arthritis symptoms, Coreson's "sense of well being [was] actually quite good[.]"  (*Id.*)

Dr. Beers saw Coreson on April 22, 2009, for followup.  He was tolerating his current medications, with "no evidence of any

12 - FINDINGS & RECOMMENDATIONS

opportunistic infection[.]" (A.R. 271) Coreson was taking hy-droxychloroquine for his rheumatoid arthritis, and was tolerating it well. He had stopped taking methotrexate in January, due to nausea. His grip strength was significantly improved on the right, at 25 kg, but was decreased somewhat on the left, at 27 kg. Coreson was getting more exercise and was improving his functional status, which he attributed, at least somewhat, to regular therapy for his vitamin D deficiency. (*Id.*)

Coreson saw Dr. Beers on September 2, 2009. He was tolerating his medications well, "with no evidence of any major toxicity [and] a very stable immunologic response[.]" (A.R. 269) Coreson had had a brief flare of his rheumatoid arthritis in July, but he "[d]ecreased his activity briefly and was able to ride it through." (*Id.*) The doctor indicated Coreson had to "be very careful to avoid too much activity," but he was "able to carry on regular activities of daily living at a somewhat attenuated level." (*Id.*) He exhibited "slightly decreased range of motion," with his worst joints being those in his feet and hands. He was started on a statin to lower his cholesterol. (*Id.*)

Coreson saw Dr. Beers for followup on December 22, 2009. His HIV was well controlled on his current medications, and he was not experiencing adverse side effects from the medications. His rheumatoid arthritis also was under good control currently, with "relatively little in the way of symptoms in hands or feet in particular." (A.R. 267) Coreson had had two episodes of cardiac dysrhythmia in the last few months, with symptoms of lightheaded-ness, irregular heartbeat, and on one occasion, paroxysmal atrial

13 - FINDINGS & RECOMMENDATIONS

fibrillation.  Dr. Beers noted his concern about these episodes, and planned to order further testing.  (*Id.*)

Coreson saw Dr. Beers on October 8, 2010, for followup.  With regard to his HIV, Coreson was doing well on his medications, and the doctor's notes indicate his "viral load [had] been persistently undetectable."  (A.R. 265)  His CD4 count had risen, and his cholesterol was under good control.  The doctor indicated Coreson's current medications "should be a good and stable regimen for him."  (*Id.*)  Coreson's rheumatoid arthritis, however, was worsening.  He was experiencing more pain in his hands, with "frank synovitis in 2 joints in the right hand and in 1 joint [in] the left hand."  (*Id.*)  His grip strength was markedly reduced on the right, down from 25 kg. at his last visit to 9 kg. currently.  The doctor put coreson back on methotrexate, and also counseled Coreson "about alternative therapies including injectables."  (*Id.*)  Coreson was still having some episodes of PSVT, usually during walks.  The doctor switched him from atenolol to metoprolol.  (*Id.*)

### B.  Coreson's Testimony

Coreson stated he has not worked since his alleged disability onset date, having left his job when he 'could no longer carry on [his] duties."  (A.R. 30)  He is HIV-positive, and has rheumatoid arthritis.  As part of the HIV disease, he also suffers from neuropathy in both of his hands and feet.  (A.R. 31)  He stated that when he was first diagnosed HIV-positive, in September 1992, he was told he had only five years to live.  (*Id.*; A.R. 44)

Coreson was able to continue working from his HIV diagnosis in 1992, until he stopped working in November 1998.  He stated his

14 – FINDINGS & RECOMMENDATIONS

"medications were so severe back then that . . . [his] function decreased." (A.R. 44) He indicated his job at Oregon Fish and Wildlife "was a nightmare." (*Id.*) He described his duties as follows: "I was in charge of the administrative functions, which included the entire accounting division, information systems divisions, licensings [phonetic] divisions, real estate divisions. Planning the legislature and presenting the budget." (*Id.*) As his health declined, his stress level increased, and his doctor told him repeatedly that stress was "not good for [him]." (*Id.*) In addition, he suffered from frequent fatigue from his medications, as well as nausea and confusion. He had difficulty concentrating, and he began relying more and more on his staff to do tasks that he, himself, should have been doing. (A.R. 45) Although he tried to keep up his pace, he was unable to do so. (*Id.*)

During the same period of time, he also was diagnosed with rheumatoid arthritis. Before his diagnosis, he had begun suffering "a lot of joint pain and swelling." (A.R. 45) His fatigue became so extreme, he was unable to work a full day. He stated, "I was coming home three times a day to just flop on the bed and relax." (*Id.*) Although his employer accommodated these breaks, Coreson eventually felt that even with the breaks, he could no longer manage his job. He testified:

> I was feeling horribly guilty, first of all, about not being able to do my job, and two, relying on particularly my assistant and putting a lot of burden on her. And finally, in November of 1998 my physician said, "You know, you really have to quit working. You're going to kill yourself. The stress is not doing anything." And my hands were swollen like water balloons at that time [leaving him unable to keyboard].

15 - FINDINGS & RECOMMENDATIONS

1  (A.R. 46)

2  Coreson stated his condition continued to deteriorate through
3  the end of 2004.  The side effects from his medications were "just
4  horribly obnoxious," including dizziness, nausea, and general
5  fatigue.  (A.R. 46-47)

6

7               *C.  Medical Expert's Testimony*

8       William Spence, M.D. testified as a medical expert.  He stated
9  he is "Board-certified in internal medicine, pulmonary disease, and
10 critical care."  (A.R. 25)  He has never examined or treated
11 Coreson, but has reviewed Coreson's medical records.  Dr. Spence
12 found Coreson has "two salient conditions."  (A.R. 32)  He first
13 addressed Coreson's HIV disease.

14      According to Dr. Spence, Coreson was first diagnosed HIV-
15 positive in about 1992.  He initially showed "grossly abnormal
16 levels of the two indices of activity"; i.e., "his viral loads
17 . . . [and] his CD4 counts."  (A.R. 32-33)  Coreson initially had
18 a high viral load and low CD4 count, but he responded well to
19 retroviral therapy, such that by 2010, there was no detectable
20 viral load, and his CD4 count had come up to a satisfactory level.
21 (A.R. 32-33)  In 1999, Coreson had "an episode of herpes zoster
22 infection," that was controlled by medication, and "[a]pparently
23 did not produce any kind of significant impairments - or persistent
24 impairments, anyway."  (A.R. 33)  Other than this infection,
25 Dr. Spence could find no evidence in the record that Coreson
26 suffered other infections characteristically seen in individuals
27 with HIV disease.  (*Id.*)

28

Coreson's other condition evidenced in the record is rheumatoid arthritis. Dr. Spence indicated this had been "sort of a slow, progressive thing, . . . not . . . marked by any described deformities," but "associated with periods of considerable amount of pain." (A.R. 34) Objective findings showed diminished strength in Coreson's hands; however, Dr. Spence found "this seemed to improve under therapy," and x-rays showed only minimal degenerative changes in his hands, right more than left. (A.R. 34-35) The April 2003 x-rays of Coreson's hands showed "no evidence of erosion of bones." (A.R. 35)

Coreson had "chronic problems with recurrent chest pain." (A.R. 35) However, Dr. Spence found no evidence of "any clear-cut cardiac problem." (*Id.*) Although the record contains notes indicating a past echocardiogram had shown a mitral valve prolapse, Dr. Spence could not find evidence in the record of "imaging studies of physical findings that suggested the presence of pro-lapse." (*Id.*) The only actual cardiac event evidenced in the record occurred in about December of 2009, when Coreson "began experiencing palpitations in the chest." (*Id.*) Doctors "noted a rapid rhythm," and an EKG "showed atrial fibrillation"; however, this was "paroxysmal" and "did not persist." (*Id.*) The event led to testing with a Holter monitor, which "demonstrated what we refer to as paroxysmal supraventricular tachycardia. In other words, just irregular but rapid heartbeat occurring in spasms." (A.R. 35-36) However, according to Dr. Spence, this was the only time atrial fibrillation was noted, and "the diagnosis was not supported by further studies." (A.R. 36) He noted Coreson "continues to have episodes of rapid palpitation from time-to-time . . . but so

far, up to the present, no cardiac pathology, symptomatology except
the report that he has a chest pain." (*Id.*)

Dr. Spence also noted Coreson has "sort of a chronic low-level
pain in his neck," that resulted in an MRI in July 2003. (*Id.*)
The MRI showed some degenerative changes at C4-5, and C5-6, with
"some bulging discs present . . . and also some foraminal stenosis
of a degenerative type that was seen - but no clear-cut compromise
of the nerves that could be noted." (A.R. 37)  Coreson also has
"some limitation of his ability to rotate his head," and "problems
with headaches, but no other problems[.]" (*Id.*)

Dr. Spence concluded that Coreson's documented problems are
HIV disease, currently "controlled," and "rheumatoid arthritis
[that] has not shown any further progressive, destructive, or per-
sisting symptoms." (*Id.*)  He found Coreson's impairments did not
meet or equal a listing, either at the time of the hearing, or in
2004, prior to Coreson's date last insured. (A.R. 37-38)
Dr. Spence indicated he had reviewed Dr. Beers's deposition testi-
mony, which he characterized as focusing largely on Coreson's
excessive fatigue at that time, but Dr. Spence did not see anything
from 2000 forward indicating Coreson continued to suffer from that
degree of fatigue. (A.R. 38-39)

Dr. Spence acknowledged that Coreson had suffered from
depression, but he "felt that it was almost [a] natural expectation
considering not only the diagnosis but at the time - in the
beginning of his HIV, before he started treatment, he was suffering
from symptoms and the knowledge of the kind of condition he
had. . . . [W]hen he was told of the diagnosis, which was in the
'90s, he was told that probably he would not survive more than five

18 - FINDINGS & RECOMMENDATIONS

years." (A.R. 39-40) According to Dr. Spence, those facts, together with Coreson's worsening rheumatoid arthritis during the same time period, logically would lead to some depression. (A.R. 40-41) Dr. Spence and the ALJ agreed that Dr. Spence was not qualified to comment on depression as a psychiatric diagnosis, and Dr. Spence noted there was no psychiatric evaluation in the record. (A.R. 43)

### D.   Third-Party Testimony

Coreson's daughter Latricia Payer testified that she is an attorney, but her law license has been inactive since 2004. At the time of the ALJ hearing, she was working as a publicist, managing all of the public relations for the Microsoft legal department. (A.R. 48-49)

In 1998, Payer was living with her father in Portland. Except for the two years from 2005 to 2007, she has lived in Portland continuously. She stated the family knew, in the early 1990s, that Coreson was HIV-positive. During the '90s, she observed her father's health become progressively worse. He frequently was fatigued. He used to play the piano, but because of the pain in his hands, he became unable to play. He also "always crocheted and he couldn't hold the crochet needle." (A.R. 50) "[H]e sometimes found it therapeutic to bake bread, but . . . that was an exercise that was also painful for him." (*Id.*) Payer stated there were a lot of physical activities her father found challenging. (*Id.*)

In Payer's opinion, Coreson's depression "was an outgrowth of his physical deterioration." (*Id.*) His inability to continue working "caused pretty significant financial stress. His relation-

19 - FINDINGS & RECOMMENDATIONS

ships were not super successful.  It was not a happy time.  And there didn't appear to be a lot of hope on the horizon[.]"  (A.R. 50-51)

Payer did not personally observe that her father had difficulty concentrating, or sticking to a task.  She "knew he was fatigued a lot," and he had difficulty doing anything, even sitting in a chair and reading, for any period of time.  She stated, "Everything was difficult."  (A.R. 51)

### E.  Vocational Expert's Testimony

The VE stated Coreson has "a singular work history as a director of a government agency," which is considered a sedentary, skilled job with an SVP of 8.[4]  (A.R. 52)  The ALJ asked the VE if Coreson's job would have had transferable skills to work requiring "a little lower SVP, perhaps to [a] semi-skilled position of some sort."  (*Id.*)  The VE indicated there would not be any transferable skills to semi-skilled work with an SVP of 3 or 4.  (A.R. 54-55)

The VE stated if an individual, who was 55 or 56 years old in 2004, was able to perform the full range of sedentary work, then "he would be able to do the past work of the director of the

---

[4]Jobs are classified with an "SVP," or level of "specific vocational preparation" required to perform the job, according to the *Dictionary of Occupational Titles*.  The SVP "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Davis v. Astrue*, slip op., 2011 WL 6152870, at *9 n.7 (D. Or. Dec. 7, 2011) (Simon, J.) (citation omitted).  "The DOT identifies jobs with an SVP level of 1 or 2 as unskilled, jobs with an SVP of 3 or 4 as semi-skilled, and jobs with an SVP of 5 or higher as skilled." *Whitney v. Astrue*, slip op., 2012 WL 712985, at 3 (D. Or Mar. 1, 2012) (Brown, J.) (citing SSR 00-4p).

government agency." (A.R. 54)  However, if that individual were "unable to complete a normal work day such that he could only work about six hours a day," then he would be unable to maintain full-time employment. (A.R. 55)

### III.   *DISABILITY DETERMINATION AND THE BURDEN OF PROOF*

#### A. *Legal Standards*

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

"Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Commissioner*, 648 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520).  The Keyser court described the five steps in the process as follows:

> (1) Is the claimant presently working in a substantially gainful activity?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments described in the regulations?  (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Keyser*, 648 F.3d at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)); *see Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f) and 416.920 (b)-(f)).  The claimant bears the burden of proof for the first four steps in the process.  If the claimant fails to meet

21 - FINDINGS & RECOMMENDATIONS

the burden at any of those four steps, then the claimant is not disabled. *Bustamante*, 262 F.3d at 953-54; *see Bowen v. Yuckert*, 482 U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987); 20 C.F.R. §§ 404.1520(g) and 416.920(g) (setting forth general standards for evaluating disability), 404.1566 and 416.966 (describing "work which exists in the national economy"), and 416.960(c) (discussing how a claimant's vocational background figures into the disability determination).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails meet this burden, then the claimant is disabled, but if the Commissioner proves the claimant is able to perform other work which exists in the national economy, then the claimant is not disabled. *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R. §§ 404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1098-99).

The ALJ also determines the credibility of the claimant's testimony regarding his or her symptoms:

> In deciding whether to admit a claimant's subjective symptom testimony, the ALJ must engage in a two-step analysis. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). Under the first step prescribed by *Smolen*, . . . the claimant must produce objective medical evidence of underlying "impairment," and must show that the impairment, or a combination of impairments, "could reasonably be expected to produce pain or other symptoms." *Id*. at 1281-82. If this . . . test is satisfied, and if the ALJ's credibility analysis of the claimant's testimony shows no malingering,

22 - FINDINGS & RECOMMENDATIONS

then the ALJ may reject the claimant's testi-
mony about severity of symptoms [only] with
"specific findings stating clear and con-
vincing reasons for doing so." *Id.* at 1284.

*Batson v. Commissioner*, 359 F.3d 1190, 1196 (9th Cir. 2004).

### B.  The ALJ's Decision

The ALJ found Coreson's date last insured was December 31,
2004.  He found Coreson has not engaged in substantial gainful
activity from his alleged disability onset date of November 17,
1998, through December 31, 2004.  He found that, through his date
last insured, Coreson had severe impairments consisting of "HIV,
rheumatoid arthritis, and degenerative disc disease of the cervical
spine."  (A.R. 13)

The ALJ found Coreson's depression caused no more than minimal
limitation in his ability to perform basic mental work activities,
and therefore his depression was not a severe impairment.  (*Id.*)
He found Coreson had only mild limitations in his activities of
daily living, social functioning, and concentration, persistence,
or pace, and Coreson had no episodes of decompensation.  (*Id.*)  He
also found Coreson's left shoulder injury and hypertension were not
severe impairments, and any cardiac problems were not severe
impairments "during the time period at issue."  (A.R. 14, 15)

Although the ALJ found Coreson to have severe impairments, he
found those impairments, singly or in combination, did not meet or
medically equal any listed impairment in the Regulations.  (A.R.
15)

The ALJ found that, through his date last insured, Coreson
retained the residual functional capacity "to perform the full

23 - FINDINGS & RECOMMENDATIONS

1  range of sedentary work as defined in 20 CFR 404.1567(a), which

2  includes lifting and carrying up to 10 pounds occasionally and less

3  than 10 pounds frequently, standing and/or walking up to two hours

4  in an eight-hour workday, and sitting up to six hours in an eight-

5  hour workday." (A.R. 16)  In reaching this conclusion, the ALJ

6  found Coreson's allegations regarding his symptoms were not fully

7  credible.  He cited the following reasons for this conclusion:

8           The available medical evidence of record does
          not support a conclusion of disability.  For
9         example, the records from Legacy Clinic in
          2004 show no flares of rheumatoid arthritis in
10        a year and only a small flare at that point,
          with no swelling or deformity.  Additionally,
11        anti-retroviral therapy was effective in
          controlling [Coreson's] HIV symptoms.  A rec-
12        ord from December 2004 notes that [Coreson]
          had been off anti-retroviral medications for
13        three years, with a stable CD4 count and
          stable viral load.  There was also no evidence
14        of opportunistic infections and no progression
          of disease.  Furthermore, an examination on
15        August 12, 2004 noted normal orthopedic and
          neurological exams.  Additionally, although
16        [Coreson] testified at the hearing that
          medical side effects were severely limiting,
17        treatment records from April 2000 note he was
          tolerating medications without difficulty and
18        his rheumatoid arthritis was under better
          control.  Accordingly, the treatment records
19        during the time period at issue, from the
          alleged onset date to the date last insured,
20        do not document objective findings that would
          support greater limitations than those
21        outlined above.

22 (A.R. 16-17; citations to exhibits omitted)

23      The ALJ gave Dr. Spence's opinion "great weight in determining

24 the severity of [Coreson's] symptoms prior to the date last

25 insured, as well as formulating the residual functional

26 capacity[.]" (A.R. 17)  The ALJ noted the state agency physicians'

27 opinions "also supported a finding of 'not disabled,'" although

28 those physicians had "concluded that there was insufficient evi-

dence in the record to assess[] a mental or physical residual func-
tional capacity for the time period prior to the date last
insured." (*Id.*)

The ALJ rejected Dr. Beers's opinion that Coreson would be
unable to work "for several hours at a time, with difficulty
attending to detail, maintaining attention, and fatigue," and
Coreson also could not sustain full-time work due to his rheumatoid
arthritis. (*Id.*) The ALJ gave the following reasons for rejecting
Dr. Beers's opinions:

> Dr. Beers did not provide a function-by-func-
> tion analysis of [Coreson's] abilities and/or
> limitations. Furthermore, his statements are
> unsupported by the contemporaneous treatment
> records in evidence, that do not document dis-
> abling levels of fatigue, or objective find-
> ings that would support such restrictive
> limitations. For example, a record from April
> 2000 notes that [Coreson] reported continuing
> fatigue, but he was actually functioning at a
> better level. Additionally, anti-retroviral
> therapy and medication for rheumatoid arthri-
> tis were effective in controlling his symp-
> toms. Accordingly, the undersigned has given
> greater weight to Dr. Spence's opinion, as
> well as the objective medical evidence, than
> Dr. Beers'[s] deposition testimony that [Core-
> son] could not sustain full time work.

(A.R. 17-18)

The ALJ rejected the testimony of Coreson's daughter because
(1) "the period under discussion was eight to fourteen years ago,
and memories do fade or become colored over time"; (2) "it would be
normal for her to support [Coreson's] allegations"; and (3) "the
medical evidence of record does not support [Coreson's] allega-
tions, and . . . Payer's testimony is not consistent with thee
medical evidence of record[.]" (A.R. 18)

25 - FINDINGS & RECOMMENDATIONS

The ALJ found that, through his date last insured, Coreson "was capable of performing past relevant work as a director, government agency." (*Id.*) He therefore concluded Coreson was not disabled at any time from his alleged onset date of November 17, 1998, through his date last insured of December 31, 2004. (A.R. 19)

### IV.  STANDARD OF REVIEW

The court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'"  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *accord Black v. Comm'r of Soc. Sec. Admin.*, slip op., 2011 WL 1930418, at *1 (9th Cir. May 20, 2011).  Substantial evidence is '"more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'"  *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).  Instead, the court must consider the entire record, weighing both the evidence that supports the Commissioner's conclusions, and the evidence that detracts from those conclusions.  *Id.*  However, if the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the court may not substitute its

26 - FINDINGS & RECOMMENDATIONS

judgment for the ALJ's. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## V. DISCUSSION

Coreson argues the ALJ erred in three respects: (1) rejecting Dr. Beers's opinions without giving "clear and convincing" or "specific and legitimate" reasons for doing so; (2) rejecting Coreson's testimony "without providing any reasons at all for doing so"; and (3) rejecting the testimony of Coreson's daughter "without offering reasons 'germane' to the witness." Dkt. #12, p. 2. Coreson argues the record evidence establishes disability, and the case should be remanded for immediate calculation and payment of benefits. Dkt. #12, *passim*.

The Commissioner agrees the ALJ's decision was not supported by substantial evidence, and "was not free of legal error." Dkt. #17, p. 2. The Commissioner states "[t]he ALJ's evaluation of medical evidence was not free of legal error," and "[t]he ALJ's step four finding is not supported with substantial evidence or free of legal error." *Id.*, pp. 8-10. However, the Commissioner argues that rather than remanding for payment of benefits, the court should remand the case for further proceedings, to allow Coreson "a de novo opportunity to present his case." *Id.*, p.; 11.

The Commissioner argues that although the record evidence does not prove Coreson is disabled, "and there are varying medical opinions on his functional ability" (i.e., the opinions of Drs. Beers and Spence), "the record does support symptoms opined by Dr. Beers that should have been included in the RFC." *Id.*, p. 9. She argues that because it is not clear whether including those

27 - FINDINGS & RECOMMENDATIONS

limitations in Coreson's RFC would render him unable to "perform other *unskilled work* existing in the national economy," the case should be remanded with directions to the ALJ to credit Dr. Beers's testimony, reformulate the RFC on that basis, and then obtain further vocational evidence regarding Coreson's ability to work given the revised RFC. *Id.*, pp. 8-11 (emphasis added).

As Coreson notes in his reply brief, the Commissioner did not defend the ALJ's decision on any grounds. She did not address the arguments that the ALJ improperly rejected Coreson's own testimony, or the testimony of his daughter. Dkt. #18, p. 2. The Commissioner concedes "the judgment must go to [Coreson]." Dkt. #17, p. 2. Thus, the only question for the court to decide is whether the case should be remanded for further proceedings, or for immediate payment of benefits.

The Ninth Circuit Court of Appeals has held that when an ALJ improperly rejects controlling evidence, the record is fully developed, and "it is clear from the record that the ALJ would be required to find the claimant disabled were [the improperly-rejected] evidence credited," the court should credit the rejected evidence and remand the case for an immediate award of benefits. *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) (citations omitted). The controlling question here is whether any further development of the record is necessary, or whether the current record supports a finding of disability.

The Commissioner appears to concede that including Coreson's limitations described by Dr. Beers in the RFC would prevent Coreson from performing skilled or semi-skilled work. Indeed, the Commissioner requests remand to determine whether, once the RFC has

28 - FINDINGS & RECOMMENDATIONS

been revised, Coreson would be able to "perform other *unskilled work* existing in the national economy." Dkt. #17, p. 9 (emphasis added). Further, the VE testified Coreson does not have skills that would transfer to semi-skilled work. (A.R. 55)

The Commissioner's Medical-Vocational Guidelines provide that individuals approaching advanced age (i.e., age 50-54) who are, as a result of their impairments, limited to sedentary work, "can no longer perform vocationally relevant past work and have no transferable skills," ordinarily are entitled to a finding of disability.[5] 20 C.F.R. pt. 404, subpt. P, app. 2, §§ 200.01(g), 201.14; *see, e.g., Scott v. Comm'r*, slip op., 2013 WL 3368969, at *2 (D. Or. July 2, 2013) (Coffin, MJ) (citing the regulation for the proposition that "a person closely approaching advanced age (50-54), who is a highschool graduate with no transferable skills is disabled if limited to sedentary work"). Coreson meets these requirements.

The court finds no further development of the record is necessary to find Coreson disabled prior to his date last insured. Substantial evidence supports such a finding.

### VI.   CONCLUSION

For the reasons discussed above, the undersigned recommends the Commissioner's decision be reversed, and the case be remanded for immediate calculation and payment of benefits.

---

[5]The exception, applicable to "recently completed education which provides for direct entry into sedentary work," does not apply here.

29 - FINDINGS & RECOMMENDATIONS

1

**VII.  SCHEDULING ORDER**

2      These Findings and Recommendations will be referred to a

3 district judge.  Objections, if any, are due by **December 22, 2014**.

4 If no objections are filed, then the Findings and Recommendations

5 will go under advisement on that date.  If objections are filed,

6 then any response is due by **January 8, 2015**.  By the earlier of the

7 response due date or the date a response is filed, the Findings and

8 Recommendations will go under advisement.

9      IT IS SO ORDERED.

10                          Dated this  3rd  day of December, 2014.

11

12                          /s/ Dennis J. Hubel

13                          _____

14                          Dennis James Hubel
                            Unites States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

30 - FINDINGS & RECOMMENDATIONS